FILED
2007 Sep-28  PM 04:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION**

| | | |
|---|---|---|
| **LANDON C. G. MILLER, and** | ] | |
| **KRISTEN MILLER,** | ] | |
| | ] | |
| **Plaintiffs,** | ] | |
| | ] | **CV-06-CV-0206-KOB** |
| **v.** | ] | |
| | ] | |
| **NEURORECOVERY, INC., et al.,** | ] | |
| | ] | |
| **Defendants.** | | |

**CONSOLIDATED WITH**

| | | |
|---|---|---|
| **LANDON C. G. MILLER, JR.,** | ] | |
| **JUDY MILLER,** | ] | |
| **DAVID LOVE,** | ] | |
| **KATHY RODGRIGUEZ** | ] | |
| | ] | **CV-06-CV-00205-JEO** |
| **Plaintiffs,** | ] | |
| | ] | |
| **v.** | ] | |
| | ] | |
| **NEURORECOVERY, INC., et al.,** | | |
| | | |
| **Defendants.** | | |

**<u>MEMORANDUM OPINION</u>**

Before the court are:  the "Motion to Dismiss by Defendants Edward Labry, John Casey, Miles Kilburn and James Terwilliger" (Doc. 20 in CV-06-206; Doc. 22 in CV-06-205); the "Motion of Neurorecovery, Inc. to Dismiss" (Doc. 21 in CV-06-206; Doc. 23 in CV-06-205); and "Defendants Jay M. Meythaler, DeAnn Meythaler, Jean Peduzzi and Andrew S. Nelson's Motion to Dismiss" (Doc. 23 in CV-06-206; 25 in CV-06-205).  Defendants filed substantially similar

1

versions of each of these motions in the two cases that have been consolidated in this court:   the case filed by Landon C. G. Miller and Kristen Miller (CV-06-206) and the case filed by  Landon C. G. Miller, Jr., Judy Miller, David Love, and Kathy Rodriguez (CV-06-205). For the reasons stated below, the court will deny these three motions to dismiss.

## FACTUAL ALLEGATIONS

Although the two actions referenced above have been consolidated, the documents in each case have received and continue to be given two separate document numbers, one for each case.  For simplicity's sake, this opinion will refer to documents as they are numbered in the original case assigned to this court, CV-06-206.  Unless specifically designated otherwise, the Amended Complaint referenced in this opinion corresponds to document seventeen  filed in this court under case CV-06-206.  Many of the facts listed below are contested, but the court assumes their truthfulness for the purposes of these Motions to Dismiss.  *See United States v. Pemco Aeroplex, Inc.,* 195 F.3d 1234, 1236 (11th Cir. 1999)(en banc).

The plaintiffs are six individual shareholders of Neurorecovery, Inc. ("NRI"), who purport to bring these actions on NRI's behalf.   They are:

- Landon Miller, Sr. ("Miller, Sr."), NRI's founder and former President, CEO and board member;
- Kristen Miller Love, daughter of Miller, Sr. and former officer of NRI;
- Landon, Miller, Jr., son of Miller, Sr.;
- Judy Miller, wife of Miller, Sr.;
- David Love, husband of Kristen Miller Love ;
- Kathy Rodriguez, former assistant to Miller, Sr.

NRI is a Delaware corporation that is named as a nominal defendant for the purposes of derivative litigation.   All individual defendants are either board members, officers, or founders of NRI.   They are:

2

- Jay Meythaler ("Meythaler"), co-founder of NRI and director at the time of lawsuit filing;
- DeAnn Meythaler, wife of Jay and director at the time of lawsuit filing;
- Andrew Nelson, husband of Jean Peduzzi, Treasurer of NRI from '99-6/04; CFO of NRI from 6/04-5/05; director at the time of lawsuit filing;
- Jean Peduzzi, co-founder of NRI and research partner of Jay Meythaler;
- Ed Labry, director of NRI at the time of lawsuit filing and primary source of NRI funding since 5/04;
- Miles Kilburn, director of NRI at the time of lawsuit filing;
- John Casey, CFO of NRI after Nelson; not director at lawsuit filing;
- James Terwilliger, VP Marketing of NRI beginning 3/05; not director at lawsuit filing.

After his son, Landon Miller, Jr., suffered a severe head injury and received treatment at University of Alabama at Birmingham ("UAB") Hospital, Miller Sr. developed a relationship with his son's treating physician, Dr. Jay Meythaler, and Meythaler's research scientist, Jean Peduzzi.   This relationship led to the creation of NRI, with Miller, Sr., Meythaler, and Peduzzi as its founders.   NRI is a patient-focused pharmaceutical and medical delivery system company which began operating in the late 1990's.  Its corporate objective is to improve the lives of persons suffering from neurological traumas, diseases, or pain through development, marketing, and sale of pharmaceuticals and medical devices.  Although NRI's operation involves more than one product, its primary undertaking was to develop a neurological drug called "4-AP" for use in treating certain severe neurological injuries.  Dr.  Meythaler was the NRI researcher involved in the "4-AP" program and its development required that NRI conduct multiple-stage trials, generate data from those trials, and have results at each trial stage approved by the United States Food and Drug Administration.  ("FDA").   While Peduzzi's research with NRI did not involve the "4-AP," Meythaler made sure that she had a prominent place in the company, lying about her experience, credentials and value to increase both of their positions in the company and to ensure

3

that their joint interest in the company was substantial.

During the development process, Meythaler falsified the results of his research concerning the 4-AP and submitted the false data to the FDA to obtain approval of 4-AP's various clinical trials.  He did not tell Miller or NRI directors about this falsification.  He also spent eighteen months on an Investigational New Device Study ("IND") but failed to publish the device and did not tell NRI about his failure to do so.   In 2002, UAB investigated Meythaler for possible conflicts of interest.  In 2003-2004, Meythaler became a 20% investor and member of the board of directors of "PVP," a company that was a direct competitor with NRI.  Meythaler did not reveal to NRI his conflicting board memberships and conveyed or arranged the delivery of NRI's sensitive and proprietary information to rival PVP.

In December of 2003, Meythaler accepted a new job at Wayne State University in Michigan.  In January of 2004, he filed a whistle-blower lawsuit against UAB and later that year moved to Michigan.   His research scientist, Peduzzi, also accepted a job at Wayne State University and she and her husband moved to Michigan.

In April of 2004, Meythaler and Miller signed a Private Placement Memorandum ("PPM") which was submitted to the Securities and Exchange Commission to raise capital for NRI.  Because Meythaler had not told Miller of his conflicts and falsifications, the PPM contained inaccuracies.   As a result of the PPM, Defendant Labry became NRI's first outside investor and joined NRI's board of directors.  In May of 2004, another NRI board member read a PPM from its rival, PVP, and discovered Meythaler's conflicting presence on both boards.  Miller, Sr. contacted Labry when he learned of Meythaler's conflict and offered to reverse the investor transaction, but Labry declined the offer and continued his relationship with NRI.

4

Miller, Sr. prepared a second PPM designed to protect NRI by decreasing the presence of

Meythaler and Peduzzi in NRI operations, but Labry rejected this PPM; he preferred to keep

Meythaler and Peduzzi on board and work with Meythaler to repair any damage to NRI.

      When confronted with the conflict, DeAnn Meythaler mischaracterized Meythaler's

interest in PVP as *de minimus* and Meythaler indicated that his attorney did not view his

membership on rival boards as a breach of fiduciary duty.   Shortly after other NRI board

members discovered the conflicting board memberships, however, Meythaler went on the

offensive.  He asserted majority ownership and in May and June of 2004, he took the following

actions:

- He fired NRI's attorney;
- He elevated himself to NRI's board of directors;
- He set up a sham board called the Scientific Advisory Board and appointed himself and Peduzzi as its sole members with a $35,000 salary;
- He directed NRI to pay for his personal attorney;
- He hired Peduzzi's husband, Nelson, as company CFO with a $120,000 salary (a position for which Nelson was not qualified);
- He required President Miller, Sr. to obtain Meythaler's approval on all company actions;
- He required Miller, Sr. to turn over complete control of NRI's financials to NRI's CFO (first Nelson and later Casey).

      Miller, Sr.  was concerned about Meythaler's adversarial approach to his board duties and

repeatedly communicated his concerns about Meythaler to directors Labry and Kilburn, but they

insisted on working directly with Meythaler instead of ousting him or diluting his control.   In

June of 2004, Kristen Miller became Vice President of Legal Affairs for NRI.   While she held

this job, she reported any known misconduct by Meythaler to NRI counsel and, among other

duties, helped to prepare a proposed initial public offering ("IPO") of NRI stock. A target date

for the IPO was set for Fall 2005.

According to the Amended Complaints, throughout 2004 and 2005, Meythaler continued his pattern of falsification of research data, suppression of research failures and trial problems with the 4-AP drug, and mischaracterization of his position with PVP.  He also wasted NRI assets by acquiring lab space that he and Peduzzi never used and told many lies to Miller, Sr. and the NRI board (i.e., lying about the Army's interest in a NRI project, his knowledge of IND regulations, his expertise with FDA human research trials, his experience with commercial IND, his "special" relationship with the FDA, and Wayne State University's willingness to allow NRI ownership of 4-AP research trials).  After moving to Wayne State University, he delayed transferring the IND application for research trials to Wayne State University, did not change the completion date of the trials, and otherwise neglected his duties.  In addition, he allowed NRI to present reports to Goldman Sachs, investment bankers, and investment banking firms knowing that, because of Meythaler's misrepresentations and suppression of information, the reports contained inaccurate and incomplete information.  Without the knowledge of NRI personnel, he communicated with an investment banker at Goldman-Sachs about combining NRI's 4-AP with a competitor's product and selling it to a third party.  Immediately after this discussion, Goldman Sachs withdrew interest in helping NRI with its IPO or assisting it with other financing.   Peduzzi, meanwhile, misrepresented her qualifications and those of other NRI personnel on an FDA medical device application.

In late April 2005, Miller, Sr. learned the real status of Meythaler's research trial for the 4-AP product, and hired some outside researchers who were familiar with FDA regulatory work to repair the damage and proceed with the human trials.  Miller, Sr. communicated to NRI directors Labry and Kilburn and NRI officer Terwilliger about the true 4-AP research status, advocating

6

dropping Meythaler and Wayne State University from this project.  Labry, Kilburn, and Terwilliger refused to follow Miller Sr.'s strategy and did not disconnect Meythaler from the trials.   In May 2005, Meythaler admitted to one of the researchers, NRI attorneys, and directors Kilburn, Labry and Miller, Sr. that the 4-AP "work was done to mininum standards and with minimum management expertise and quality control."

In April 2005, PVP submitted a new drug to the FDA which directly competed with a NRI drug.  In submitting that new drug, PVP used a  regulatory strategy of NRI that Labry had confidentially communicated to Meythaler and Meythaler had, in turn, wrongfully shared with PVP. When NRI discovered the submission on the FDA website, Meythaler heard about NRI's discovery and warned PVP to withdraw it.

From June 2005 through August 2005,  Miller Sr. and Kristen Miller communicated with NRI directors Labry and Kilburn and NRI counsel about postponing the IPO because of Meythaler's misconduct.  Despite Meythaler's misconduct, directors Labry and Kilburn continued to support Meythaler and retaliated against Miller, Sr. and Kristen Miller.  In July 2005, Bank of American Securities denied NRI's request for financing of its proposed IPO.  After that denial, Terwilliger admitted that the failed IPO was his fault and that directors Labry and Kilburn had also been at fault because they did not do enough to attract investors or financing from investment banks.

In August 2005, Peduzzi and Meythaler signed a NRI patent inventorship declaration for a product that they did not invent.   Also in August, 2005, Kilburn, Meythaler and two Wayne State University employees conferred in a conference call about possible fraud regarding the UAB trial, and in that call, Kilburn blamed Miller, Sr. for the problems.

On August 18 and 19, 2005, Miller, Sr. discussed Meythaler's "extensive fraud" with directors Labry and Kilburn and his daughter, Kristen.  He recommended confronting Meythaler and removing him from the board of directors, taking a different research trial approach, and restructuring NRI.   In those meetings, Labry and Kilburn falsely stated that they would take action against Meythaler and Nelson.  Specifically, they promised to require Meythaler "to sign a letter that he would never communicate with the FDA," but they did not do so.   In addition, they stated that they would remove Nelson from NRI, but they did not do so; he remained on NRI's payroll as a consultant.   Labry and Kilburn acknowledged Meythaler's fraud against and suppression of information from NRI, but when the Millers repeated their concerns about how unhealthy it was for NRI to have Peduzzi and Meythaler associated with NRI, Labry and Kilburn dismissed those concerns.

Later in August 2005, Kilburn terminated Kristen Miller from NRI's employment without cause.   In September 2005, Meythaler threatened the pharmacist who was supplying 4-AP for NRI's research trials and the threats caused the pharmacist to quit working with NRI.   Later that month, the 4-AP trials were discontinued at Wayne State University because continuing the trials under Meythaler had no medical research value or commercial value.   Without board approval, NRI moved its headquarters to Memphis, Tennessee, at the direction of Kilburn and other defendants, wasting NRI money

On October 6, 2005, Plaintiffs filed in state court the shareholder derivative actions that have been removed to this court.  They did not make a formal, pre-suit demand upon the board of directors before filing suit.   Two days later, on October 9, 2005, the NRI board of directors held a meeting via teleconference and removed Miller, Sr. from his director and employment positions in

retaliation for filing the lawsuit.   In November 2005, Labry and Kilburn terminated nearly all

company personnel, effectively halting all of NRI operations.   Although the FDA granted NRI's

application for a commercial IND for NRI to continue research of the 4-AP, Meythaler's poor

research and bad conduct caused significant time delays and cost increases. The remaining

directors and officers continue to mismanage NRI, failing to respond to a separate lawsuit, failing

to file an annual report with the state of Tennessee, failing to file a notice to shareholders upon

issuance of a new PPM, and failing to communicate appropriately with shareholders.   Defendants

removed the shareholder derivative action to federal court on January 30, 2006 based on diversity

jurisdiction.


## DEFENDANTS' MOTIONS TO DISMISS

The Defendants articulate four grounds for dismissal: (1) Plaintiffs' failure to make a pre-

suit demand on the NRI board precludes these derivative suits; (2) Plaintiffs are inadequate

representatives to bring these derivative suits; (3) NRI's corporate charter immunizes the

Defendants who are NRI directors from Plaintiffs' claims;  and (4) the allegations fail to state a

claim upon which relief can be granted.


## <u>Standard of Review</u>

In reviewing a motion to dismiss, the court "must accept the allegations set forth in the

complaint as true."  *See United States v. Pemco Aeroplex, Inc.,* 195 F.3d 1234, 1236 (11th Cir.

1999) (en banc).  *Lotierzo v. Woman's World Medical Center, Inc.,* 278 F.3d 1180, 1182 (11th Cir.

2002).  Similarly, it must construe all the factual allegations in the light most favorable to the

Plaintiffs.  *Sofarelli v. Pinellas County,* 931 F.2d 718, 721 (11th Cir. 1991) (citing *Scheuer v. Rhodes,* 416 U.S. 232, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1947).  However, "conclusory allegations and unwarranted deductions of fact are not admitted as true in a motion to dismiss."  *S. Fla. Water Mgmt. Dist. v. Montalvo*, 84 F.3d 402, 409 n. 10 (11th Cir. 1996).  Such a motion may be granted only "when the movant demonstrates 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80 (1957)."  *Harper v. Blockbuster Entertainment Corp.,* 139 F.3d 1385, 1387 (11th Cir. 1998).

The court notes, however, that three of the four grounds articulated in the motions to dismiss address these suits' derivative nature and implicate Rule 23.1 of the Federal Rules of Civil Procedure.  Pleading requirements in derivative suits are more stringent than requirements of notice pleading.  *Brehm v. Eisner,* 746 A.2d 244, 254 (Del. 2000).  Consequently, this court will apply the more stringent requirements as appropriate and will address in detail the heightened standards in the "Pre-Suit Demand Requirement" section of this opinion.

### Discussion of Four Proposed Grounds for Dismissal

### (1) Pre-Suit Demand Requirement

Plaintiffs bring this shareholder derivative suit on behalf of NRI.  They concede that they made no formal demand on NRI's board of directors to sue, claiming that any demand would have been futile and, therefore, excused.  Defendants disagree.  To  determine whether a plaintiff's pleading of demand futility is adequate in diversity cases,  courts must look to the law of the state of incorporation. *Kamen v. Kemper Fin.  Servs., Inc.,* 500 U. S. 90, 96, 111 S. Ct. 1711,  1713,

114 L. Ed2d 152 (1991).  In the instant case, NRI was incorporated in Delaware and the parties

agree that  Delaware law governs this issue.

Defendants correctly state that the right to sue is a business decision which belongs to the

corporation.  *See Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).  Therefore,  its directors, who

"are empowered to manage, or direct the management of, the business and affairs of the

corporation" would normally assert this right.  *Id.*(citing 8 *Del. C. § 141(a)*); s*ee Kamen,* 500 U. S.

at 101, 111 S. Ct. at 1719.  To protect the directors' prerogative not only to bring suit but also to

correct any internal abuses without litigation,  Rule 23.1 of the  Federal Rules of Civil Procedure

requires shareholder Plaintiffs to make a demand on the board of directors before bringing suit on

the corporation's behalf.  *Stepak v. Addison,* 20 F.3d 398, 402 (11th Cir. 1994).  The pre-suit

demand is not absolute, however; the court may excuse demand where the shareholder Plaintiffs

properly plead that it would have been futile.  *Kamen,* 500 U.S. at 96, 111 S. Ct. at 1711.

### (1) a.  Demand Futility

To plead demand futility under Delaware law, Plaintiffs

> must sufficiently set forth "particularized factual allegations" establishing
> that a majority of the board of directors cannot properly exercise its sensible
> business judgment to proceed with the claim.  *Aronson v. Lewis,* 473 A. 2d
> 805, 814 (Del. 1984), *overruled on other grounds by Brehm v. Eisner,* 746 A.
> 2d 244 (Del. 2000).  Demand will be excused if, under the particularized
> facts alleged in satisfaction of Rule 23.1, a reasonable doubt exists that a
> majority of the directors are disinterested and independent. *Id.*

*Foley v. McCabe,* 424 F. Supp. 2d 1315, 1319-20 (M. D. Fla. 2006)(applying Delaware law).

The Supreme Court of Delaware has described its approach to the "reasonable doubt" standard as

follows:

> [I]t would be neither practicable nor wise to attempt to formulate a criterion
> of general application for determining reasonable doubt . . . .Reasonable

11

doubt must be decided by the trial court on a case-by-case basis employing
an objective analysis.

*Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988) *overruled on other grounds by Brehm v. Eisner*,

746 A.2d 244 (Del. 2000).  Thus, this court's initial determination is whether Plaintiffs have

stated particular facts that raise a reasonable doubt that a majority of NRI's directors were

disinterested and independent.  At the time of Plaintiffs' lawsuit, NRI's board was composed of

six directors: Defendant Jay Meythaler, Defendant DeAnn Meythaler, Defendant Nelson,

Defendant Kilburn, Defendant Labry, and Plaintiff Miller, Sr.  Plaintiffs need only raise

reasonable doubt about three out of these six directors; an evenly divided board necessarily means

no majority and, therefore, demand is excused.  *See Beam v. Stewart,* 845 A.2d 1040, 1046 n.8

(Del. 2004)(citing *Beneville v. York,* 769 A.2d 80, 85-86 (Del. Ch. 2000)).

The primary focus of the Amended Complaints is the alleged bad conduct of director Jay

Meythaler and the NRI board's alleged failure to hold him accountable.  Defendants concede the

interest of  Meythaler, as well as that of  his director wife, DeAnn Meythaler.  Because the interest

of those **two** directors is obvious and, therefore, rightfully acknowledged, Plaintiffs must at a

minimum raise reasonable doubt about **one** of the remaining four directors.  Although Plaintiffs

claim that all of these directors except Plaintiff Miller, Sr. himself were interested and  incapable

of exercising independent judgment,  their best argument rests on the shoulders of director

Nelson.  The court first will address whether Plaintiffs' pleadings successfully raise reasonable

doubts about the disinterest and independence of director Nelson.

### (1) b. Presumption of Faithfulness and Heightened Pleading Requirements of Rule 23.1

Plaintiffs' task is a difficult one.  The law presumes that directors will be "faithful to their

fiduciary duties." *Beam v. Stewart,* 845 A. 2d 1040, 1048-49 (Del. 2004).  In addition to having

the burden to overcome that presumption, Plaintiffs in derivative shareholders cases claiming

demand futility also face the heightened pleading requirements of Rule 23.1; that rule provides in

relevant part:

> The complaint shall also allege with particularity the efforts, if any, made by
> the plaintiff to obtain the action the plaintiff desires from the directors or
> comparable authority and, if necessary, from the shareholders or members, and
> the reasons for the plaintiff's failure to obtain the action or *for not making the
> effort.*

Fed. R. Civ. P. 32.1 (emphasis added).  Delaware courts have repeatedly acknowledged that the

requirement of particularized pleadings is a strict threshold - one that can prevent a plaintiff from

bringing suit without first making a demand on the board, even when a plaintiff's underlying

claim is meritorious.  *Landry v. D'Alessandro,* 316 F. Supp. 2d 49, 59 (Del. Ch. 2004); *see*

*Brehm v. Eisner,* 746 A.2d 244, 267 (Del. 2000).  As the Delaware Supreme Court noted,

> there is a very large - though not insurmountable - burden on stockholders who
> believe they should pursue the remedy of a derivative suit instead of selling their
> stock or seeking to reform or oust these directors from office.  Delaware has
> pleading rules and an extensive judicial gloss on those rules that must be met in
> order for a stockholder to pursue the derivative remedy.

*Brehm,* 746 A.2d at 267.

    While the pleading requirement is stringent under Rule 23.1, Plaintiffs need not plead

evidence and are entitled to all reasonable factual inferences that logically flow from the alleged

particularized facts.  *Brehm,* 746 A.2d at 245.  They must plead, however, particularized factual

statements that are essential to the claim (the ultimate or principle facts).  *Id.*  at 254.  Conclusory

allegations are not considered to be pleaded facts or factual inferences.  *Id.* at 245.

    Defendants contend that Plaintiffs pleadings fail to meet Rule 23.1's "particularized facts"

13

standard because their amended complaints are replete with conclusory statements and preface many allegations with the phrase "upon information and belief."  Indeed, Defendants point out that the "Amended Complaint contains no fewer than sixty-one allegations formulated only 'upon information and belief.'"  While Delaware courts have not squarely addressed whether allegations prefaced "upon information and belief" meet Rule 23.1's standard of particularity, a federal court in Massachusetts applying Delaware law considered this issue in *Landry v. D'Alessandro,* 316 F. Supp. 2d 49, 59 (Mass. 2004).

In *Landry,* the court could find no controlling law addressing that language in the context of Rule 23.1, so it turned to another rule requiring particularity in pleading: Rule 9(b) for fraud. The *Landry* decision quotes the following language as informational:

> Allegations based on 'information and belief' ...do not satisfy the particularity requirement unless the complaint sets for [sic] the facts on which the belief is founded.  Furthermore, th[e] requirement of pleading supporting facts applies 'even when the fraud relates to matters peculiarly within the knowledge of the opposing party.'

*Id.* (quoting *New Eng. Data Servs. Inc. v. Becher,* 829 F.2d 286, 288 (1st Cir. 1987)).  Perhaps Defendants wish that this court would apply Rule 23.1 to nullify completely the sixty-one allegations that begin with "upon information and belief."  This court will not do so, because the Amended Complaints in some instances set out facts to support that belief.  Plaintiffs are entitled to all reasonable factual inferences that logically flow from the alleged particularized facts. *Brehm v. Eisner,* 746 A.2d at 245. However, in keeping with the strict requirements of Rule 23.1, this court will only consider conclusory statements and matters asserted  under "information and belief" if particularized facts in the Amended Complaints reasonably and logically support them.

**(1) c.  Pleadings Regarding Nelson's Interest and Independence in the Amended Complaints**

14

Plaintiffs' Amended Complaints plead the following "facts" regarding director Nelson and his wife:

- Nelson is married to Defendant Jean Peduzzi, Meythaler's research assistant.
- Meythaler installed Nelson as CFO of NRI (a job for which he was not qualified and which paid the salary of $120,000) as *quid pro quo* for Peduzzi's concealment of Meythaler's fraud against NRI.
- Nelson's previous job as a UAB auditor paid a salary of $55,000.
- Meythaler and Peduzzi convinced the NRI board to require Miller, Sr. to turn over all of NRI's financial matters to Nelson from May 2004 to May 2005.
- Prior to and during NRI's June 2007 board meeting, Meythaler and Peduzzi conspired to set up a shell NRI board called the Scientific Advisory Board paying board members a $35,000 per annum salary, as a way of funneling money to Jay Meythaler and Peduzzi.
- From 1997 through 2003, Meythaler lied to director Miller, Sr. about Peduzzi's research experience, credentials and value to RNI so that she would have a more prominent position at NRI, so that his own position at NRI would be strengthened, and so that his interest combined with hers would result in a controlling interest (62%) in NRI.
- Peduzzi's career is closely tied with Meythaler; she worked with him at UAB and after he moved from UAB to Wayne State University in Michigan "in or about June 2004," Peduzzi also moved to Wayne State University.  Meythaler and Peduzzi were working together and asking NRI to acquire lab space for their research  "in or about the fall of 2004."   The service addresses for the Meythalers and Peduzzi and Nelson are in Michigan.
- On or about May 25, 2005, at the board meeting in Memphis, Tennessee, Miller, Sr. urged director Labry to force Meythaler **and Peduzzi** out of NRI or dilute them out of company control.  Labry responded that his vote was with  Meythaler **and Peduzzi.**
- In or about February 2005, Peduzzi misrepresented her abilities, experience and qualifications on a FDA medical device application for an  NRI product.  She also incorrectly stated that NRI personnel were not qualified to complete the application, costing NRI extra expenses and causing a delay in the approval process.
- On or about May 25, 2005, at a board of directors meeting in Memphis, Tennesse, the Meythalers, Peduzzi, *and Nelson* began a relentless barrage of unsubstantiated, personal attacks on Miller, Sr.
- On or about August 8, 2005,  Meythaler **and Peduzzi** fraudulently signed a NRI patent inventorship declaration for a product that they did not invent.
- On or about July 21, 2005, Nelson conspired with Terwilliger and  Meythaler to take over control of NRI.  The purpose of the takeover was to cover up Meythaler's wrongful acts such as providing confidential information to a NRI  rival and

covering up research problems.

- In August 2005, Miller, Sr. communicated concerns to Labry and Kilburn about NRI's leadership and as a result, they promised to remove Nelson from employment at NRI but they did not do so.

These allegations, while not always artfully worded, do contain particularized information such as specific names, dates, occasional locations, and details about the wrongful acts. This court must determine whether these facts raise reasonable doubts about director Nelson's interest and independence.

Under Delaware law, a director is interested when "divided loyalties are present, or a director has received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the stockholders." *Pogostin v. Rice,* 480 A.2d 619, 624 (Del. 1984) *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). Similarly, when a board decision threatens to have a "materially detrimental impact on a director" which is not equally shared, the director would be influenced by the adverse personal consequences of the decision and could not exercise disinterested judgment. *Rales v. Blasband,* 634 A.2d 927, 936 (Del. 1993).

Plaintiffs' Amended Complaints contain varied allegations, ranting about the NRI board and officers' gross mismanagement of the company. When the court attempts to distill the Amended Complaints down to their essence, however, the central claim is that NRI leadership failed to hold Meythaler accountable for his bad conduct, causing damage to the company. A secondary but still significant claim is that NRI leadership similarly failed to hold Jean Peduzzi accountable for her own bad acts. Jean Peduzzi just happens to be director Nelson's wife. Any pre-suit demand would naturally have urged NRI to fire Meythaler and Peduzzi, to sue them for breach of contract, breach of fiduciary duties, fraud and other bad acts, and to fire or sue other

16

members of the NRI leadership who participated in or enabled those bad acts by Meythaler and Peduzzi. In other words, a pre-suit demand would have asked director Nelson to consider firing and/or suing his own wife and Meythaler, for whom she worked.

Defendants make light of Nelson's spousal relationship with Peduzzi as "insufficient to create a doubt as to his disinterestedness." This court disagrees and, frankly, wonders at such a detached and impersonal view of the marriage relationship. Firing Peduzzi would undoubtedly strain husband-wife relations and would also decrease the family income by at least $35,000. Suing Peduzzi would place spouses on opposite sides of litigation and cause further financial challenges. Such actions against Peduzzi would certainly have a detrimental impact that would be personal to Nelson and that other directors would not equally share. Further, any lesser demands, if met, still would have had an adverse impact on Meythaler and Peduzzi, and ultimately on Nelson.

Defendants' focus on Jay Meythaler as the sole malfeasor is short-sighted; the Amended Complaints do paint Meythaler with the blackest brush, but his alleged partner-in-crime is undoubtedly Peduzzi. According to the pleadings, Peduzzi and Meythaler conspired to set up a shell NRI board to funnel money into their pockets, jointly signed a fraudulent patent inventorship declaration, and schemed to install Nelson in a high-paying NRI job for which he was not qualified. Peduzzi allegedy concealed Meythaler's faulty research and Meythaler lied to get Peduzzi a NRI job. Consequently, any pre-suit demand on the NRI board would place director Nelson in the quintessential position of divided loyalties: he would be caught between his obligation to NRI as its director; to his wife, Peduzzi; and to Meythaler, his and Peduzzi's benefactor.

17

In addition, the allegations in the Amended Complaints do not confine the malfeasance to Peduzzi and Meythaler, with Nelson always as the "innocent by-stander."  At times, they list Nelson as an active co-conspirator.  Significantly, when Miller, Sr. repeatedly begged board members to oust or dilute problem directors and re-structure the company, he went to Labry and sometimes Kilburn, but not to Nelson.  The reason he did not involve Nelson is obvious: Nelson is one of the people that he was trying to throw out of the company leadership.  The other people on Miller, Sr.'s ouster list were near and dear to Nelson: Peduzzi and Peduzzi's partner, Meythaler.

Defendants assume, however,  that any pre-suit demand would have ignored Nelson and Peduzzi's bad acts and concentrated on the misconduct of Meythaler and NRI's failure to prevent and punish it.  If this court accepts this assumption, Nelson would still fail the independence test. "[T]o show lack of independence, the complaint of a stockholer-plaintiff must create a reasonable doubt that a director is not so 'beholden' to an interested director. . .that his or her 'discretion would be sterilized.'"  *Beam v. Stewart,* 845 A.2d 1040, 1050 (Del. 2004) (quoting *Aronson v. Lewis,* 473 A.2d 805, 816 (Del. 1984)).   Defendants concede Meythaler's interest.  Consequently, if Plaintiffs' pleadings create a reasonable doubt about Nelson's ability to make a judgment independent of Meythaler, then plaintiffs succeed on their demand futility claim.  Under Delaware law,

> to render a director unable to consider demand, a relationship must be of a
> bias-producing nature.  Allegations of mere personal friendship or a mere
> outside business relationship,  standing alone, are insufficient to raise a
> reasonable doubt about a director's independence.  Some professional or
> personal friendships, which may border on or even exceed familial loyalty and
> closeness, may raise a doubt about whether a director can appropriately
> consider demand.. . . .This doubt might arise either because of financial ties,

18

> <u>familial affinity</u>, a particularly close or intimate personal or business affinity
> or because of evidence that in the past the relationship caused the director to
> act non-independently vis a vis an interested director. . . .Mere allegations that
> they move in the same business and social circles, or a characterization that
> they are close friends, is not enough to negate independence for demand
> excusal purposes. . . .To create a reasonable doubt about an outside director's
> independence, a plaintiff must plead facts that would support the inference
> that because of the nature of a relationship or additional circumstance other
> than the interested director's stock ownership or voting power, the non-
> interested director would be more willing to risk his or her reputation than the
> relationship with the interested director.

*Beam v. Stewart*, 845 A.2d at 1050-2 (emphasis added).

Does Nelson's relationship with Meythaler fit into the "friendly business associate" category - which does not suggest dependence - or the "intimate, bias-producing relationship" category - which does?   Nelson and Meythaler's service on the same board together is not enough to create a reasonable doubt about independence. *See id.* at 1047.  Similarly, the mere fact that Peduzzi, Nelson's wife, and Meythaler worked together would not raise reasonable doubt. Demand futility simply requires more.  Turning to the pleadings, which the court must take as truthful, the relationship between Peduzzi/Nelson and Meythaler goes beyond that of friendly colleagues.  As Plaintiffs paint him, Meythaler is at best the couple's intimate friend and, at worst, their co-conspirator.  He manipulated NRI into placing the couple into prominent NRI positions, lying about Peduzzi's experience and ignoring Nelson's lack of qualifications.  These manipulations represented a financial windfall to the couple, doubling Nelson's previous salary and adding $35,000 to Peduzzi's own.  Their relationship is apparently so symbiotic that when the Meythalers moved from Birmingham to Michigan, Peduzzi and Nelson moved, too.  In short, the pleadings contain facts that elevate the relationship between Meythaler and Peduzzi/Nelson past a mere business association into one of dependency, weaving together their personal and

professional lives and financial fortunes.  Both Peduzzi and Nelson are beholden to Meythaler for their employment.  According to Plaintiffs, no doubt arises  that the couple would be willing to risk their reputations to support their relationships; they had already done so.  Despite any fiduciary obligations to NRI, Meythaler had already lied to support Peduzzi and Nelson; Peduzzi and Nelson had lied to support Meythaler.  The court finds that the intertwining nature of the families' relationship as well as the past acts of dependence combine to raise reasonable doubts about Nelson's ability to make judgments independent of Meythaler.  Accordingly, Plaintiffs' allegations raise a reasonable doubt about the disinterest and independence of at least three directors and successfully plead demand futility.

The parties disagree about whether the "demand futility" test in *Aronson v. Lewis* (generally based on a challenged board action or a conscious board decision not to act) or that in *Rales v. Blasband* (generally based on board inaction) applies in the instant case.  *See Aronson v. Lewis,* 473 A.2d 805, 813 (Del. 1984)*; Rales v. Blasband,* 634 A.2d 927, 933-934 (Del. 1993)*; see also Abbott Laboratories Derivative Shareholders Litigation,* 325 F.3d 795, 804-5 (7th Cir. 2001)*.*  Because this court finds that the pleadings raise a reasonable doubt on the disinterest and independence issue, the pleadings meet either test of demand futility.  Defendants' Motions to Dismiss on this ground will be denied.

### (2) Adequacy of Plaintiff Representatives

Defendants' second ground for dismissal contends that Plaintiffs are inadequate representatives to bring this derivative action.  Rule 23.1 of the Federal Rules of Civil Procedure and Delaware law both require that a derivative plaintiff be a fair and adequate representative of

the shareholders or members similarly situated.  Fed. R. Civ. P. 23.1; s*ee Emerald Partners v. Berlin,* 564 A. 2d 670, 673-74 (Del. Ch. 1989); *Youngman v. Tahmoush,* 457 A.2d 376, 379 (Del. Ch. 1983).  To evaluate a representative's adequacy, courts examine many factors, including "economic antagonism between the representative and class; the remedy sought by the plaintiff in the derivative action; indications that the named plaintiff was not the driving force behind the litigation; plaintiff's unfamiliarity with the litigation; other pending litigation between the plaintiff and defendants; the relative magnitude of plaintiff's personal interest compared to his interest in the derivative action itself; [and the] plaintiff's vindictiveness towards the defendants and the degree of support plaintiff was receiving from the shareholders he purported to represent." *Youngman,* 457 A.2d at 379-80.

In the instant case, Plaintiffs' Amended Complaints state that they meet the requirements set forth in Rule 23.1, including that they are shareholders; that the action is not a collusive one to confer jurisdiction on this court; and that they are fair and adequate representatives.  The facts asserted throughout the Amended Complaints, when taken as true, would appear to support the Plaintiffs' adequacy.  Plaintiff Miller, Sr. was a founder of NRI and the court could certainly characterize him not only as the driving force behind this litigation but also the original driving force behind the company.  Kristen Miller was an officer of NRI and Landon Miller, Jr. was the inspiration behind its founding.  These plaintiffs would naturally have a great interest in NRI, and a familiarity with this litigation.  While antagonism exists between Plaintiffs and Defendants (as discussed, *infra*), the pleadings do not reveal antagonism between the Plaintiffs and those shareholders whom they claim to represent.  Rather, the Amended Complaints portray Plaintiffs as desiring to repair NRI's internal problems and mismanagement and to resurrect its integrity and

viability.

Defendants challenge Plaintiffs' adequacy and their pleadings of adequacy.  However, Defendants bear the burden of proving that Plaintiffs are inadequate representatives under  Rule 23.1; Plaintiffs do not have the burden to *disprove* Defendants' claims about their inadequacy. *See Youngman v. Tahmoush*, 457 A.2d 376, 381-2 (Del. Ch. 1983)(denying defendants' motion to dismiss because defendants had not met their burden of proving plaintiff's inadequacy from the record).

Because of the present configuration of Rule 23.1, it can be misread as requiring Plaintiffs to plead with particularity their adequacy of representation.  Interestingly, the 2007 amendments to Rule 23.1 avoid this misreading by reconfiguring the rule and clearly indicating that the particularized pleading requirement is limited to allegations of demand/demand futility.  Although the amendment does not take effect until December 1, 2007 (absent contrary Congressional action), the Advisory Committee Notes to the 2007 Amendment state that the amendment is *not* a change of existing law but a reconfiguration of Rule 23.1 to reflect more accurately the law as it already exists.  Consequently, under Rule 23.1, Plaintiffs must fairly and adequately represent the interests of the shareholders, but Defendants have the burden of proving that Plaintiffs are not fair and adequate representatives.

In attempting to disqualify Plaintiffs as representatives in the instant case, some of the Defendants claim that Plaintiffs have "an antagonism toward NRI" which creates an inherent conflict of interest.  The allegations in the Amended Complaints (and the existence of multiple lawsuits that NRI directors filed against Miller, Sr. in state court) depict a high level of antagonism between Plaintiffs and Defendants.  Does that factor, standing alone, disqualify

Plaintiffs as adequate representatives?

In explanation of the "antagonism" factor, the Delaware court has stated:

> [i]nadequacy as a class representative is not made out merely because of a discordant relation between plaintiff and defendants. To the contrary, this may inspire plaintiff to be an even more forceful advocate. The fact that plaintiff may have amorphous hostile feelings against defendants is not itself relevant to the court given the absence of any concrete fact which reveals a conflict of interest *between plaintiff and the class* sufficient to make his representation inadequate.

*Emerald Partners v. Berlin,* 564 A.2d 670, 676 (Del. Ch. 1989 (emphasis added and citation omitted). Indeed, antagonism between a plaintiff and defendant is to be expected in most situations. In a shareholders' derivative action, court may note the level of antagonism between plaintiffs and defendants but the better focus is on the level of conflict or antagonism between the named plaintiff and the class he represents. *See, e.g., Nolen v. Shaw-Walker,* 449 F.2d 506 (6th Cir. 1971)(finding conflict where the plaintiff was a mere front man for the driving force behind litigation, who was another person attempting to force a merger between the defendant corporation and another business that the second person owned). Consequently, antipathy between Plaintiffs and Defendants does not alone disqualify Plaintiffs to bring a derivative suit.

The consolidated Defendants contend that by bringing separate, individual breach of contract claims for money damages, the Plaintiffs create economic antagonism between their own interests and those of the other shareholders. While Plaintiffs admit that a successful litigation will pay individual Plaintiffs, they contend that it will also benefit all shareholders. Delaware law supports Plaintiffs' stance, agreeing that "[t]he fact that the plaintiff may have interests which go beyond the interests of the class, but are at least co-extensives with the class interest, will not defeat his serving as a representative of the class." *Youngman*, 457 A.2d 376 at 380.

23

Finally, Defendants contend that Plaintiffs are inadequate representatives because Plaintiffs represent only a minority of stockholders.  The Plaintiffs do not state in their Amended Complaints whether they hold a majority of  NRI stock.  They do not state that they seek to represent the named Defendants, who may indeed hold that majority.  To the contrary, they seek to represent shareholders *other* than the named Defendants.   Delaware law allows them to do so even if Defendants hold the majority stock: "A stockholder derivative claim may be maintained although it does not have the support of a majority of the corporation's shareholders or even the support of all the minority stockholders."  *Emerald Partners v. Berlin,* 564 A.2d 670, 74-5 ( Del. Ch. 1989)(citing *Nolen v. Shaw-Walker Company,* 449 F.2d 506, 508, n.4 (6th Cir. 1971); 7C WRIGHT, MILLER & KANE, *Federal Practice and Procedure:* Civil § 1833 (1986 & 1988 Supp.)).

When ruling upon a Motion to Dismiss, this court must look to the facts set forth in the Amended Complaint. On the record before it, this court cannot find that Defendants have met their burden of demonstrating Plaintiffs' inadequacy to represent the designated shareholders. Accordingly, the court will deny Defendants' Motions to Dismiss on this issue without prejudice to raise it at the class certification stage.

### (3) Immunization Provisions in NRI's Corporate Charter

Defendants' third ground for dismissal focuses on the exculpatory provision in NRI's corporate charter, which provides in pertinent part:

> 5.02 A director of the Corporation will not be personally liable to the Corporation or its stockholders for monetary damages for injury resulting from a breach of such director's fiduciary duty as a director, except for liability (a) for injury resulting from a breach of such

24

> director's duty of loyalty to the Corporation and its stockholders, (b)
> for injury resulting from acts or omissions not in good faith or which
> involve intentional misconduct or a knowing violation of law, (c)
> under Section 174 of the Delaware General Corporation Law, as the
> same exists or  hereafter may be amended, or (d) for injury resulting
> from any transaction from which the director derives an improper
> personal benefit. . . .

(Doc. 24 Ex. 2  at  2). Delaware General Corporate Law allows such an exculpatory

provision.  8 Del. C. § 102(b)(7).  "[T]he shield from liability provided by a certificate of

incorporation provision adopted pursuant to 8 Del. C. § 102(b)(7) is in the nature of an

affirmative defense. Defendants seeking exculpation under such a provision will normally

bear the burden of establishing each of its elements."  *Emerald Partners v. Berlin,* 726 A.2d

1215, 1223-4 (Del. 1999).

 In the instant case, Defendants raised the charter exculpatory provision.  Because

the exculpatory provision's shield is an affirmative defense (which is raised here, in part, by

affidavit), this court should not require Plaintiffs to have pled particularized facts to

contradict its application.   The court notes, however, that the facts alleged in the Amended

Complaints, while not proven at this point in the litigation,  would place NRI

director/Defendants within the exculpatory provision's exceptions.  As the parties seeking

the provision's protection despite the allegations, Defendants/NRI directors have the

burden of demonstrating that they acted in good faith and, therefore, that the provision

applies.  *See Emerald Partners,* 726 A.2d  at 1224 (noting that the burden was on the

Defendant directors to demonstrate their good faith, not upon Plaintiffs to establish the

directors' bad faith).  Defendants rely on evidence outside Plaintiffs' Amended Complaints

in support of their motions on this issue, and further, the application of that evidence raises

25

fact questions.  Therefore, disposition at this stage of the proceedings pursuant to a motion under Rule 12 is premature.  Accordingly, Defendants' Motions to Dismiss on this issue are denied without prejudice to raise the matter by motion for summary judgment at the appropriate time, if they so desire.

### (4) Failure to State a Claim upon which Relief Can be Granted

The final ground for dismissal in Defendants' Motion to Dismiss asserts that Plaintiffs' Amended Complaints otherwise fail to state a ground under which relief can be granted.  "The threshold of sufficiency that a complaint must meet to survive a motion to dismiss for failure to state a claim is. . .exceedingly low."  *Ancata v. Prison Health Serv's., Inc.,* 769 F.2d 700, 703 (11th Cir. 1985)(internal quotations omitted).  In reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, the court must construe all factual allegations as true "and resolve them in the light most favorable to the plaintiff."  *Beck v. Deloitte & Touche,* 144 F.3d 732, 735 (11th Cir. 1998).  The court may grant the motion only if the court clearly and beyond doubt cannot award the plaintiff relief under any set of facts that could be proved consistent with the allegations of the complaint.  *See id.* at 735.  Accordingly, "[i]n seeking dismissal for failure to state a viable claim, a defendant thus bears the very high burden of showing that the plaintiff cannot conceivably prove any set of facts that would entitle him to relief."  *Id.* at 735-36.  Having examined the pleadings, the court finds that Defendants have not met that "very high burden."  Thus, the court will deny Defendants' Motions to Dismiss on this ground and on all other grounds presented.

The court notes, however, a ground for dismissal that has not been presented: the Amended Complaints were not verified as required by Rule 23.1.  The Amended Complaints were signed by Plaintiffs' counsel, not Plaintiffs.  Accordingly, the court will dismiss this case if Plaintiffs do not rectify this violation of Rule 23.1.

The court will enter a separate ORDER consistent with this memorandum opinion.

DATED this 28th day of September, 2007.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

27